## PEOPLE *v.* ANSLEY

1. HOMICIDE—MURDER—DUE PROCESS—EVIDENCE—ADMISSIBILITY—STATEMENT.

  Failure to advise criminal defendant of his right to have appointed or retained counsel with him *during interrogation* by police about a homicide renders an exculpatory statement made by him at the interrogation inadmissible in evidence at trial for murder, even where defendant was advised generally of his right to assistance of counsel and his right to remain silent.

2. CRIMINAL LAW—DUE PROCESS—INTERROGATION—ASSISTANCE OF COUNSEL—WAIVER.

  Failure of defendant to request representation by an attorney before making a statement does not constitute a waiver of the right to be represented by an attorney during police interrogation.

3. CRIMINAL LAW—INTERROGATION—ASSISTANCE OF COUNSEL—EVIDENCE—ADMISSIBILITY—STATEMENT.

  The rule which bars from evidence at criminal trials all statements made by a defendant before he is advised that he has

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 3] 21 Am Jur 2d, Criminal Law § 314.

Accused's right to counsel under the Federal Constitution. 18 L Ed 2d 1420.

Necessity of informing suspect of rights under privilege against self-incrimination, prior to police interrogation. 10 ALR3d 1062.

[2] 21 Am Jur 2d, Criminal Law § 317.

[3] 29 Am Jur 2d, Evidence § 614.

a right to be represented by an attorney during police interrogation applies to statements of avoidance as well as confessions.

Appeal from Recorder's Court of Detroit, Elvin L. Davenport, J. Submitted Division 1 June 6, 1969, at Detroit. (Docket No. 4,168.) Decided August 26, 1969.

Charles Ansley was convicted of second-degree murder. Defendant appeals. Reversed and remanded for new trial.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Samuel J. Torina,* Chief Appellate Lawyer, and *Thomas P. Smith,* Assistant Prosecuting Attorney, for the people.

*Carl Levin* (Defenders' Office, Legal Aid and Defender Association of Detroit), for defendant on appeal.

Before: HOLBROOK, P. J., and McGREGOR and BRONSON, JJ.

McGREGOR, J. Again, this Court is required to reverse a trial court's ruling sustaining an insufficient police warning to a criminal defendant regarding his constitutional rights under the *Miranda*[1] rule, and grant an obviously guilty murderer a new trial.

The strangled body of Cebell Jemison was found lying in the bathtub by her daughter on Sunday morning, August 21, 1966. The body bore evidence of struggle, in part manifested by contusions and

_____
[1] *Miranda* v. *Arizona* (1966), 384 US 436 (86 S Ct 1602, 16 L Ed 2d 694, 10 ALR3d 974).

hemorrhages of the larynx. The testimony introduced to convict defendant[2] was mainly circumstantial. Defendant had been living with the victim, but had moved out two weeks before she was murdered. A business card and a card with a written telephone number on it, which had been given to the defendant the day before, were found in the bathtub. Defendant's glasses were found behind the toilet in the bathroom. A package of Viceroy cigarettes was found floating in the bathtub. Defendant normally smoked this brand; the victim usually did not. By his own testimony, defendant had been with the victim the previous evening and until about 1:10 a.m. on the fatal Sunday morning. A daughter of the deceased testified that she heard defendant threaten to kill her mother during the time that he was living there.

On the morning the victim was murdered, defendant was arrested approaching the victim's house. He had scratches on his face and an empty eyeglass case in his shirt pocket. The arresting officer attempted to advise defendant of his constitutional rights. The arresting officer's testimony was as follows:

"*Q.* When you met the defendant at the front of the house, what conversation did you have with him, if any?

"*A.* He was coming up to the door, and I met him right at the door, and the door was still open, and I observed that he had scratches on or about his nose; and I also noticed that he had an eyeglass case in his shirt pocket and the case was empty, so I informed the defendant that he was under arrest for murder, and I immediately told him of his constitutional rights.

---

[2] Defendant was convicted of second-degree murder, CL 1948, § 750.317 (Stat Ann 1954 Rev § 28.549),

"*Q.* What did you tell him?

"*A.* I told him that he didn't have to say anything if he didn't want to, and that anything he said could be used against him in a court; and I told him that he had a right to have an attorney before he said anything, and that if he couldn't afford an attorney, the court would appoint one before he said anything."

An attempt was made again by the interrogating detective at the police station to advise the defendant of his constitutional rights before defendant's statement and his subsequent signature thereto. Questions by the assistant prosecuting attorney, examining the detective at the trial, disclosed the following:

"*Q.* And where and when did you first see him?

"*A.* About 8:20 a.m. on August the 21st of 1966.

"*Q.* And where?

"*A.* At the homicide bureau, Detroit police headquarters.

"*Q.* Do you know who brought him to you?

"*A.* He was brought in by a scout car.

"*Q.* Will you describe his appearance at that time?

"*A.* He was wearing—he was wearing a blue silk head cloth and a green sport shirt, tan pants, black shoes; he had a cast around his body for a back operation, he said, he had a diamond in his left ear, and he had fresh scratch marks on his neck, which were very slightly bleeding.

"*Q.* Did you make any statement to him about his constitutional rights at that time?

"*A.* Yes, sir, I did.

"*Q.* And just what did you tell him?

"*A.* I showed him a form and read it to him and explained the form to him.

"*Q.* And what did you state to him?

"*A.* Do you want me to read the form?

"*Q.* Yes.

"*A.* I advise you that you have a constitutional right to refuse to make a statement or to answer any questions put to you. I advise you that anything you may say may be used against you in a court of law, in the event of prosecution, and I advise you you have a right to counsel; and I further advised him if he didn't have the money to procure counsel, the court would appoint him one.

"*Q.* Did he make any statement to you?

"*A.* Yes, sir, he did.

"*Q.* Did you make any record or notes of the statement?

"*A.* Yes, sir.

"*Q.* Did you read it back to him after you made those notes?

"*A.* Yes, sir.

"*Q.* Did he sign the statement in your presence?

"*A.* Yes, sir.

"*Q.* Is that the statement?

"*A.* Yes, sir."

During the trial, the judge, in the absence of the jury, conducted a *Walker*-type hearing[3] as to the voluntariness of defendant's statement. Although defense counsel objected to the admission of the statement because of a lack of showing of voluntariness, the court found the statement to be voluntarily made. The signed statement was then read to the jury.[4]

---

[3] *People* v. *Walker* (On Rehearing, 1965), 374 Mich 331.

[4] After the court, in the absence of the jury, found the defendant's written statement was voluntarily made, the assistant prosecuting attorney examined the interrogating detective as follows:

"*Q.* Now, witness, you have in your hand people's exhibit number 6, which is the statement which you referred to in your earlier testimony?

"*A.* Yes, sir.

"*Q.* Would you please relate that to the court and jury?

"*A.* 'I have been living common law with Cebell Jemison for 11 months. I was over her house yesterday all day till about 4:30; then I went and drove my 1956 Buick Convertible, color white,

Defendant claims that the officers failed to inform him that he was entitled to have *counsel present with him during* custodial questioning, which was not refuted. While the defendant raises six issues in his brief, the controlling issue is the question of the applicability of the *Miranda* rule, requiring that defendant be informed of his right to assistance of counsel, retained or appointed, before questioning and the giving of his statement, and that defendant be informed that he may have counsel present during interrogation. The issue is clearly within the purview of *Miranda* v. *Arizona, supra,* fn 1. The defendant made a statement while subject to custodial police interrogation, which was later used in court.

The United States Court of Appeals, Fifth Circuit, has spoken again on the rule announced in regard to a *Miranda* warning, in *Windsor* v. *United States* (CA 5, 1968), 389 F2d 530, 533, 534:

"Appellant contends that the Government agents failed to advise him that he had the right to have

license number HB–9758, to the King Auto Sales, on Eleven Mile, where I picked up Cebell's son, William Jemison's check. William came with me. We got back to her house about 11 p.m. Me and Cebell then walked over my house, and we had relations, and I took her home about 1 a.m. We didn't have a fight, and I told her I would see her for breakfast in the morning. I didn't say what time. I then went to a blind pig at Meldrum, between Sylvester and Pulford. I stayed all night, drank beer and played records. I came back to Cebell's house this a.m. and was arrested. I moved from Cebell's two weeks ago because A.D.C. had been called by someone. I left my glasses somewhere last night, I don't know where. I was drunk. I smoke Viceroy cigarettes, but I didn't lose any last night.'

"He then identified the pair of glasses that we recovered at the scene as his, and he stated he was scratched on the neck and nose by an unknown prostitute the night before last.

"Q. Witness, I will show you people's exhibit 2, and ask if these are the glasses that you showed the defendant?

"A. Yes, these are the glasses.

"Q. And are those the glasses that he identified as being his?

"A. They are the glasses.

"Q. And he so identified them to you?

"A. He did."

an attorney, retained or appointed, present during the initial interrogation when he gave the incriminating oral statement at his motel or later when he signed the written incriminating statement.
*   *   *

"In *Miranda* v. *Arizona* (1966), 384 US 436, 478, 479 (86 S Ct 1602, 1630, 16 L Ed 2d 694), the Supreme Court said:

"'*   *   * 'we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, *that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.* Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.
*   *   *

"There is no question that Windsor was then in custody and deprived of his freedom. Failure to give the full *Miranda* warnings at that time was undoubtedly a violation of the prohibition against taking a confession from a defendant while in police custody without first informing him that he is en-

titled to the presence of counsel, retained or appointed. *Merely telling him that he could speak with an attorney or anyone else before he said anything at all is not the same as informing him that he is entitled to the presence of an attorney during interrogation and that one will be appointed if he cannot afford one.* The obvious purpose of the agents interrogating him was to elicit an incriminating statement for 'the investigation was no longer a general inquiry into an unsolved crime,' but had begun 'to focus on a particular suspect,' namely, Windsor. See *Escobedo* v. *Illinois* (1964), 378 US 478, 490, 491 (84 S Ct 1758, 1765, 12 L Ed 2d 977).'' (Emphasis supplied.)

Although involving a felony committed before June 13, 1966 (the date of the *Miranda* decision), a more recent decision (April 22, 1969), of the United States Supreme Court has reiterated the applicability of *Miranda,* in *Frazier* v. *Cupp* (1969), 394 US 731, 737, 738 (89 S Ct 1420, 22 L Ed 2d 684, 692, 693):

"[P]etitioner was given a somewhat abbreviated description of his constitutional rights. He was told that he could have an attorney if he wanted one and that anything he said could be used against him at trial. Questioning thereafter became somewhat more vigorous, * * * Petitioner still was reluctant to talk, but after the officer sympathetically suggested that the victim had started a fight by making homosexual advances, petitioner began to spill out his story. Shortly after he began he again showed signs of reluctance and said, 'I think I had better get a lawyer before I talk any more. I am going to get into trouble more than I am in now.' The officer replied simply, 'You can't be in any more trouble than you are in now,' and the questioning session proceeded. A full confession was obtained and, after further warnings, a written version was signed.
* * *

"Petitioner argues that his statement about getting a lawyer was sufficient to bring *Escobedo* into play and that the police should immediately have stopped the questioning and obtained counsel for him. We might agree were *Miranda* applicable to this case, for in *Miranda* this Court held that '[i]f * * * [a suspect] indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning.' 384 US 444, 445. But *Miranda* does not apply to this case."

The warnings given the defendant did not comply with the mandatory requirements of *Miranda* and its progeny. The defendant was not clearly informed that he had the right to counsel and to have counsel with him during interrogation, as recently set forth in *People* v. *Whisenant* (1968), 11 Mich App 432. Defendant was not informed that he had a right to appointed counsel during interrogation, if he so desired, as required in *Miranda*. The fact that the defendant did not request counsel before making a statement does not constitute a waiver of that right. *People* v. *Limon* (1966), 4 Mich App 440.

*Miranda* clearly applies to defendant's statement, even though it was a statement of avoidance and not a confession; *Miranda* applies to statements which are exculpatory as well as those which are inculpatory, as long as the obvious purpose of the. interrogator was to elicit an incriminating statement from the accused.

This Court has heretofore interpreted the *Miranda* requirements in *People* v. *Whisenant, supra* (p· 437):

"The testimony taken at the *Walker* hearing held in the case at hand, although indicating a voluntary confession under former standards, does not demon-

strate compliance with *Miranda, i.e.,* nowhere does it appear that defendant was informed of his right to have counsel, retained or appointed, present during questioning and the giving of his statement. Merely informing defendant at the time of arrest that he had a right to counsel did not meet the requirements of *Miranda.*

"Because this Court is bound by the decision of the United States Supreme Court in *Miranda* v. *Arizona, supra,* we are required to hold the alleged confession inadmissible."

It is unnecessary to consider defendant's other alleged errors in this limited opinion, as they may not occur in a new trial.

Defendant's conviction is set aside and the case is remanded for a new trial.

All concurred.